## Howard Fire Insurance Company *versus* Bruner.

1. Though it was provided in a policy of fire insurance that the conditions annexed were "to be used and resorted to to explain the rights and obligations of the parties" in cases not specially provided for; yet in an action by the assured on such a policy it was *Held* that the assured might show the knowledge of the agents of the insurance company of the character of the property; that the description was as prepared by such agent; and that the omissions in the policy complained of by the Company were made by him because he considered them immaterial; therefore the validity of the policy did not depend on the completeness of the written description.

2. One of the questions propounded to the applicant for insurance on a woollen factory was what kind of lamps are used and are they all covered: if any open lights are used state in what rooms: *Held*, that this question referred to the lamps which were habitually used and not to the hand-lamp used to light up with.

3. One of the inquiries made was whether the property proposed for insurance was *mortgaged;* and if so, the amount. In the reply the encumbrances by ground-rent and mortgage were stated. Afterwards another mortgage was executed and an existing policy was assigned as collateral security for it: *Held*, that the execution of the second mortgage, without notice to the Company, did not avoid the policy.

[Howard Fire Insurance Company v. Bruner.]

THIS case came up from the Nisi Prius, *Philadelphia.*

It was an action by James P. Bruner, to the use of Paul Thurlo, *v.* The Howard Fire Insurance Company. The *narr.* was in *assumpsit.* The action was on a policy of insurance, executed by the defendant on a stone building used as a woollen and cotton mill, and on the machinery contained therein. The insurance was to the amount of $6000, viz., $3000 on the building and on fixed machinery; and $3000 on movable machinery therein; and was for one year from 17th July, 1851. The mill and machinery were injured by fire on the 12th November, 1851.

The company was an incorporated company in the state of Massachusetts, having their office at Lowell. H. Coggshall and A. S. Gillette were their agents at Philadelphia for taking risks and obtaining insurances. The application of Bruner was made to the office of the agents in Philadelphia, and the answers to the questions propounded were signed by him there on the 17th July, 1851. The application was forwarded to the company, as alleged on the part of the company *for its approval;* the policy purported to have been signed at Lowell; and it was stated to have been countersigned on the 25th of the same month by Gillette and Coggshall, at Philadelphia, and afterwards delivered to Bruner.

In the policy, reference was made to the survey and description No. 3931, on which the policy was based. It was also declared in the policy that it was "made and accepted in reference to the conditions thereto annexed, which are to be used and resorted to in order to explain the rights and obligations of the parties in all cases not otherwise provided for."

Among the conditions annexed to the policy and referred to as above, are the following:—

"If, after insurance is effected on any building or goods in this office, the risk shall be increased by any means within the control of the assured, or if such building or premises shall, with the assent of the assured, be occupied in any way so as to render the risk more hazardous than at the time of insuring, such insurance shall be void and of no effect."

"A false description by the assured of a building insured, or of its contents; or in a valued policy an over valuation, shall render absolutely void the policy issuing upon such description or valuation; but the office will be responsible for the accuracy of surveys and valuations made by its agents."

"When a policy is made and issued upon a survey and description of certain property, such survey and description shall be taken and deemed to be part and portion of such policy and warranty on the part of the assured."

At the trial the plaintiff put in evidence the policy No. 3931, proved the title to the property, its destruction by fire on the 12th

of November, 1851, the amount of loss, and notice thereof to the defendants, and rested.

The case of the defendants was then opened, and there was given in evidence the application for insurance, in which the following answers, among others, are given by the plaintiff to the following questions : The answers were subscribed by him in writing.

*Question.*—What kind of goods are made, and of what materials are they made ? *Answer.*—Woollen yarn, and some weaving of woollen and cotton goods.

*Question.*—What kind of lamps are used, and are they all covered ? If any open lights are used state particularly in what rooms ? *Answer.*—Closed lights.

*Question.*—How are the several stories occupied ? *Answer.*—Basement for machine shop and for purposes of manufacturing woollen yarn, as above.

*Question.*—Are the building and machinery both owned by the applicant for this insurance ? If not, state by whom, and the nature of your interest ? *Answer.*—Yes.

*Question.*—Are the works operated on account of the proprietor, or are they rented, or are they let to run by the yard ? *Answer.* —Yes, by the proprietor.

*Question.*—Is the property mortgaged, and if so, state the amount? *Answer.*—$2000 ground-rent, and $6000 mortgage on the building.

*Question.*—How many hands are employed in the factory, and what proportion are men ? *Answer.*—Twenty-nine or less.

The *defendants* then gave in evidence the statement of the plaintiff, sworn to January 1, 1852, by way of preliminary proof of loss. The record of agency of A. S. Gillette, with authority "to bind the company to take risks in the city of Philadelphia." Also the record of two mortgages, one to Paul Thurlo, for $5000, and one to Christopher Bockius, for $1100. Also testimony by a number of witnesses who had been engaged about the buildings in various capacities, to the effect that the building, from the time of the insurance being effected till the fire, was occupied by the plaintiff and others who rented from him, he furnishing the steam-power. Two persons had a machine-shop in the *first* story ; another person occupied the *third* story, being engaged in the weaving of woollen and cotton goods ; the plaintiff occupied the *fourth* story in the spinning of woollen yarn ; and D. & J. Donnelly occupied the *second* story for spinning woollen and cotton yarn. They used raw cotton ; they had a picker-room and picker, and were picking cotton on the day of the fire. The building took fire on the 12th of November, 1851, about 6 o'clock in the evening, before the hands had ceased work. It originated in the picker-room of the Donnelly's, and a few minutes before the fire was discovered, an *open light* was seen placed on a stool opposite and close to the

[Howard Fire Insurance Company *v.* Bruner.]

door of their picker-room. The picker-room had a door-way, but no door.

Besides the mortgage for $6000, reported in the application of July 17, another for $5000, in favor of Paul Thurlo, was executed on July 25, 1852; and one for $1100 in favor of C. Bockius, on the 25th of October of the same year; of neither of which was notice given to the company. The plaintiff was in the habit of visiting the factory daily; was there on the 12th of November, and had left but a short time before the fire commenced. The number of hands employed about the factory during the whole time was about seventy. An open light was generally used in the building to light up with. Since the fire, they use a covered light to light up with.

On part of the plaintiff, testimony was given by B. F. Clark, who stated that, acting for Gillette & Coggshall, he solicited Bruner to insure; That, on the 17th July, 1851, he surveyed the building of Bruner—he went through it, and knew how it was occupied— Bruner was with him—Bruner signed an application *in blank;* That he (Clark) took it home and filled it up, and gave it to Gillette & Coggshall. The paper was a blank of the Howard Insurance Company. He said he wrote down Bruner's answers from recollection. He wrote them down correctly. He filled up the blank from his own knowledge of the building and from what Bruner had said to him. He added that Bruner did not, to his knowledge, see the application after it was filled up.

Coggshall testified that he had visited the premises with a view to the risk, and knew by whom the defendant's rooms were occupied, and by whom the machinery was owned. He was absent from the city when the application was filled up and the policy countersigned.

Gillette testified, that he had not visited the building before the risk was taken—Clark brought to the office the application signed by Bruner in blank—it was not the proper form, and the witness prepared another; That they had in the mean time received other blanks. He had some knowledge of the building from risks they had taken for other companies. He said that Bruner said that Falkner and Lewis and himself occupied the first story, the Donnellys the second story, and McNutt the third. He said that at the time the question was put to Bruner as to the number of hands, he thought that Bruner gave him the number of his own hands. The question was asked more in reference to his own hands. In relation to the question whether the buildings and machinery were both owned by Bruner, the witness said that he told Bruner that this question referred more particularly *to his own interest;* and that he told him that the question as to whether the works were operated on account of the proprietor, or rented, referred more particularly to his own operations.

[Howard Fire Insurance Company *v.* Bruner.]

Gillette further testified that he knew of the subsequent mortgage to Thurlo from the fact of a policy probably of the Hudson River Company having been brought to the office for transfer, as collateral security for that mortgage. This was before the fire. Bruner's application was on the 17th July. The policy issued on the 25th. He did not think that the application brought to the office by Clark was before him when he drew the last application. He said that, at the time he wrote the application, Bruner communicated fully the state of the building.

Coggshall was recalled, and testified that he would not have charged Bruner any lower rate if the building had been occupied exclusively by himself; also, that he would not have charged any more if others were in the building with many more operatives, if they carried on the same business, and he superintended it himself. Where there are more hands, they can put out a fire quicker. He further said they considered Bruner's the most hazardous risk in the building.

The case was tried before GIBSON, J. He charged that the party would be bound to disclose everything material to the risk, and he referred to the jury to judge whether there had been any misdescription. He observed that the question in regard to the lamps referred to the lamps habitually used, and did not refer to the hand-lamp to light up. The answer to the question how the several stories were occupied, he referred to the jury. He charged that the machinery, the ownership of which was inquired of, was the machinery intended to be insured; That the works referred to in the next question were *Bruner's works*—Bruner's part of the factory. Also, that the answer as to the mortgage was correct at the time; that he did not see how the subsequent mortgages could affect the policy; that they did not affect the risk; that he considered that the answer as to the number of hands employed, meant the number of hands employed in *Bruner's part of the factory*. He further charged that, if it should seem to the jury that these answers were taken down correctly by the agent, and that Bruner kept back anything that was material to the risk, which would increase the risk, then the plaintiff could not recover; but if he disclosed everything fully and fairly, and the fault or error, if any, was on the part of the defendants' agent who undertook to reduce to writing the plaintiff's answers, then the verdict ought to be in favor of the plaintiff.

March 16, 1853, verdict for plaintiff for $6375.

It was assigned for error, 1. That the Court erred in admitting parol evidence to explain, vary, or contradict the written contract ascertained in the policy and application; 2. In admitting the testimony of B. F. Clark; 3. In admitting the testimony of Coggshall; 4. In admitting the testimony of Gillette.

[Howard Fire Insurance Company *v.* Bruner.]

*Tschudy* and *H. M. Phillips*, for plaintiffs in error.—It was said that there were in the application several material misrepresentations, viz.:—1. In regard to the kind of goods, and the materials from which they were made. 2. In regard to the number of hands employed. 3. In regard to the kind of lights used. 4. In regard to the tenancy and the manner of occupation of the different stories. 5. In regard to the amount of mortgage on the building. It was contended that it was not competent to receive evidence with the view of showing that such misrepresentations occurred in consequence of erroneous instructions given by the agent of the company as to the meaning and application of the questions. That the writing itself should be the evidence of the intention of the parties: 1 *Greenleaf Ev.*, § 275, 305; *Id.* p. 554, 573; 1 *Ph. Ev.*, ch. 10; *Starkie Ev.*, part 4, p. 996–1015. The same rule is administered in a Court of Equity: 7 *Ves.* 211. Such representations were unwarranted and beyond the scope of the agent's authority: *Story on Ag.*, § 73–6, 105, 114, 115, 165–6.

Statements in the application, when that is made part of the policy, of the purposes for which the property insured is to be occupied, and of its situation as to other buildings, are *warranties*, although the variance is not material to the risk; and parol evidence that the assured truly informed the agent of the insurance company, who prepared the application, as to such particulars, is not admissible: 2 *Denio* 75; 8 *Met.* 348; 10 *Id.* 211; 6 *Wend.* 488; 3 *Comst.* 122; 5 *Hill* 188; 12 *Wend.* 456; 10 *Barbour* 285; 8 *Howard* 235; 6 *Hump.* 176; 6 *Cushing* 42.

As to the subsequent mortgages, it was said that the incidental knowledge acquired by Gillette of the mortgage to Thurlo, did not amount to *notice of it*. The company was not informed of it. That it was not material that they were executed after the delivery of the policy. That the execution of one for $5000, on the day of the delivery of the policy, and only seven days after the answer, was a legal fraud: 2 *W. & Ser.* 506; 2 *Duer on Ins.* § 25; 1 *Marshall* 450; 1 *Phil. on Ins.* 524–534.

In cases of warranties, the materiality of the facts warranted is of no consequence: 1 *Term Rep.* 343. Even if the plaintiff did make a full disclosure to the agent, he should not have signed the misstatement or accepted the policy.

*Campbell*, for defendant in error.—It was contended that the evidence as to the correctness of the statements made by the assured was admissible. Reference was made to 5 *Rawle* 342; 7 *W. & Ser.*, Susquehanna Insurance Company *v.* Perrine.

As the company gave the agents the seeming authority, and the power to mislead, it would be a fraud to let them take advantage of the inaccuracy in question. It was alleged that the whole con-

tract was made through the agents, whose countersign was necessary after the approval of the company.

As to the mortgages, it was observed that neither the policy or the condition required the insured to give notice of a subsequent mortgage; also when the $5000 mortgage was given, Bruner assigned a policy of insurance on the same building, as collateral security for it, and it could not increase the risk if an *existing policy* or the same one was assigned *and no other insurance made.*

If, upon a proposal and agreement for a life insurance, a policy be drawn up by the insurance officer, in a form which differs from the terms of the agreement, and varies the rights of the parties assured, equity will interfere and deal with the case on the footing of *the agreement*, and not on that of the policy: 12 *Eng. L. & Eq.* 171; 2 *Duer*, § 12.

The opinion of the Court was delivered by

Lowrie, J.—There can be no doubt that there are important errors and omissions in the written description on which this policy purports to be founded: but the plaintiff has explained all this by the testimony of the defendants' agents, who prove that they knew all about the property from the verbal description of the plaintiff to them, and from having surveyed it with a view to this insurance, and that the description was made out under their advice and counsel, and then signed by the plaintiff. This raises the main question, was this legitimate evidence?

It is very apparent from all the evidence, that this policy was not entered into by the defendants on the faith of the plaintiff's answers contained in the written application and description; for many of the questions which are very material are only partly answered or not at all; and the whole treaty for the insurance and its terms were completed by the defendants' agents, who knew all about the property. There is, therefore, no merit in this defence on the ground of the defects of the description; and the law can have no object in sustaining it, except in order to preserve some valuable rule of its own from violation.

It is not unworthy of notice that this is plainly an insurance on a woollen and cotton mill in operation, though not as described; yet in one of the clauses of the policy it is provided that if, after the making of the policy, the building should be used for the purpose of carrying on any trade specified in the memorandum of special rates (and it specifies both woollen and cotton mills), then the policy should be void. We mention this as one of those instances that show that, when a business becomes common and general, we have often to look more to the general character of the transaction than at the special form which it seems to assume in the filling up of printed blanks, prepared to fit the most common

[Howard Fire Insurance Company v. Bruner.]

class of cases, and not in every instance properly altered to suit the special case.

It is objected that the evidence given is in violation of the rule that protects written contracts from being varied by oral testimony. Is it so?

Strictly speaking, the description of the property is part of the contract only so far as it defines the subject-matter of the insurance. The description of it, which is made for the purpose of fixing the character of the risk, is only one of the steps leading to the contract.

But it is said that the parties have made it part of the contract, by declaring that the conditions annexed to the policy " are to be used and resorted to, in order to explain the rights and obligations of the parties." Now one of those conditions is that a false description by the agents of the assured shall avoid the policy, but not so of description by the agents of the insurers. Another is that a description shall be taken as a part of the policy, and as a warranty on the part of the assured. If, therefore, this description is by the assured, then the contract of insurance is conditioned on its truth and accuracy.

Is it so? We think it is not, though he signed it. It was all written by the defendants' agent. The plaintiff informed him of all that is now insisted on as material omissions, and they were omitted by the agent because he deemed them immaterial. It is therefore a description by the agent of the insurers, and the conditions of the policy referring to a description by the assured have nothing to do with the case. Any other interpretation of this transaction would allow insurers to make a fraudulent use of the confidence which is always placed in them at a treaty for insurance, and which they always invite. It follows that all the evidence tending to show the knowledge of the defendants' agents of the character of the property, and their acts in relation to the description, were properly admitted, and that the validity of the policy does not depend upon the completeness of the written description.

We think the learned judge was also right in what he said about the lamps used for lighting, and about the Thurlo mortgage. He neglected to charge as to the effect of any increase in the risk with the assent of the plaintiff, after the making of the policy, but we do not discover any evidence to sustain the point.

Judgment affirmed.