MASSACHUSETTS BONDING & INS. CO. v. WORTHY.   (No. 3574.)

Court of Civil Appeals of Texas.   Texarkana.
Aug. 11, 1928.

Rehearing Denied.   Oct. 4, 1928.

Holland & Moore, of Dallas, for appellant.
Edwards & Hughes, of Tyler, for appellee.

HODGES, J. This suit was instituted by the appellee to recover benefits which he claims had accrued under the provisions of a health and accident policy issued by the appellant in January, 1925. The policy provided for the payment of $2,000 in case of death by accident; it also provided for the payment of certain indemnities for disability resulting from sickness or accident. This suit is for indemnities for total disability resulting from an accident which occurred on October 7, 1925.

Appellee alleged that he was injured on the date above mentioned, by a fall from a scaffold, while he was engaged in pursuing his occupation as a painter. He asked for $60 per month as indemnity for loss of time from that date, less what had been previously paid to him by the appellant. In addition to the indemnities, he asked for reimbursement for certain hospital expenses and for penalties and reasonable attorney's fees. Appellant answered by general and special exceptions, and specially pleaded that theretofore, without knowing the true facts, it had mistakenly paid appellee the sum of $400, to which appellee was not entitled. It denied that he was wholly and continuously disabled and thereby prevented from performing any and every duty pertaining to any business or occupation. It denied that he had suffered a total loss of time as a result of the injury. It further alleged that the policy issued to the appellee was void by reason of certain untrue statements and representations made by the appellee in his application for the insurance; that those false statements were made with intent to deceive, and materially affected the risk assumed by the appellant. By way of supplemental petition, appellee admitted that the application did not contain true and correct statements, but he alleged that he had given appellant's soliciting agent true and correct information, and that the agent perpetrated a fraud upon appellee by not inserting the correct facts in the application.

The case was tried before a jury on special issues. Upon the answers returned, the court entered a final judgment against the appellant for the aggregate sum of $2,330.54, composed of the following items: Monthly indemnities, $1,140, covering the period from April 7, 1925, to November 7, 1927, with the addition of $51.30, as interest; hospital expenses, $164, together with interest thereon amounting to $18.86; legal penalties provided for by statute, $156.48; attorney's fee, $800.

The record contains a number of assignments of error, but we shall discuss only those which we regard as the more important. What we consider the most serious objections to the judgment are the following: (1) That the policy was void because of the false representations in the application for the insurance; and (2) that the evidence conclusively shows that appellant was not totally incapacitated to follow any and every occupation. The application attached to the policy contained the following statements:

"Subdivision 10. No application ever made by me for life, accident, or health insurance has been declined, nor any such policy of insurance canceled or renewal refused by any company, association, or society, except as follows: (No exceptions.)"

There were other statements alleged to be untrue, but those quoted will be sufficient for the discussion of the assignments presenting that objection. It is admitted by the appellee that the statements referred to above are not true. In order to evade a forfeiture upon that ground, he alleged and offered testimony to prove that he made a full and truthful statement of the facts to the appellant's soliciting agent at the time the insurance was applied for; that he signed the application in blank at the instance of the agent and with the understanding that the agent would thereafter fill the blanks according to the information which the appellee had given; that without his knowledge the agent inserted incorrect representations, of which appellee knew nothing until after the injury occurred. Upon that issue appellee stated that Andrews, the appellant's agent who took the application, visited the appellee at his home after the day's work had ended. He testified:

"After he (the agent) seated himself, he says, 'How about that insurance policy?' I says, 'I don't know, Mr. Andrews,' I says, 'I have had some trouble with insurance policies, and I don't feel much interested.' He says, 'What trouble have you had?' I says, 'I have been to the hospital on four or five different occasions, and another company has canceled my policy.' The Pacific Mutual Insurance Company had canceled my policy. * * * I says, 'Suppose I get hurt or sick or something and during my illness along come a letter canceling my policy, I would be blowed up; they have got my money and I have got nothing.' He says, 'Well, you ought to have taken it out with a good company at first; you wouldn't have had that experience.' I says, 'They all say that.' He says, 'Our company don't do that.' He says, 'That company does that very often.' I says, 'I have no assurance you will.' He says, 'Well, you try this company, and you will find out; it is a very strong company, and we don't cancel policies.' We talked on, and he pulled out a piece of paper. It was an application for insurance. (Witness is shown original application.) That is my signature, but that is not my writing in the blanks up there. I think I began working for the Cotton Belt Railroad along in November of 1922. * * * I told Mr. Andrews that

I was in the hospital several times. I told him very distinctly about my hospital experience. I told him about being under the care of doctors that I have described here. I told him everything that I knew about it. I told him that sitting there in my dining room the night he came to take my application. At the time he came to take my application, and in connection with his taking of my application I told him about the trouble I had had with the Pacific Mutual Life Insurance Company. When he took that application he asked me my name and initial. He wrote that in. He asked me my address and description, height, weight, and age. He wrote that in. He didn't write anything else in the application. He asked me what my occupation was. I says, 'I am a painter for the Cotton Belt Railroad Company.' I didn't tell him that I was any particular kind of a painter. I did not in any way limit the kind of painting that I did. I told him about the doctor treating my blood. * * * After Mr. Andrews wrote my name, description, and address, he didn't write anything else in the blanks while he was there. He didn't ask me any other questions. After he finished writing my name and age and description he says, 'I have got a lot of work to do to-night, and it is getting late,' says, 'I will finish these things up to-night.' He asked me to sign it. He handed me the paper to sign. The places below my name and description were not filled in at the time I signed it. He said, 'I will fill this out when I get to the hotel.' I depended on his filling it out properly. I depended on his honesty to fix that thing up as he promised to at the house. * * * I told him everything from start to finish, all about my hospital trips and everything about my sickness and all. Then he made the remark to me when he got up to leave, says, 'Now, let me tell you something; don't you get sick for fifteen days; if you do you won't get a nickel for it; but,' he says, 'you can go right outside and get hurt right now if you want to; your policy will be in effect; but don't get sick.' "

The witness further stated that the policy came to him through the mail; that he did not open the envelope and read the policy when he received it, but put it in a box for safe-keeping. It remained there until it was burned in a fire which destroyed his house. A duplicate policy was thereafter issued by the company and sent to him by mail. He put the duplicate in his box at the bank without reading it. He did not know that Andrews, applicant's agent, had incorprated any untrue statements in the application until after his injury and after the company had notified him that it would stop the payment of any further benefits under the policy. Appellee was corroborated by three other witnesses who were present at the time the application was signed by him. While appellant's agent, Andrews, testified to the contrary, the jury determined the conflict in the evidence in favor of the appellee.

The question then arises, Is the appellant estopped to assail the validity of the policy because of the untrue representations contained in the application? In answering that question, we must assume that the appellee fully and fairly stated to Andrews, appellant's agent, all the essential facts called for by the application; that the agent requested appellee to sign the application before those answers were incorporated, and agreed to later insert correct answers in the application; that, without the knowledge or consent of the appellee, Andrews knowingly inserted the false answers, and sent the application to his company without giving the appellee an opportunity to examine it.

In a case involving issues and facts somewhat similar, the Supreme Court of the United States said:

"The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption—when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith and not as a shield for unfair dealing." Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, 36 S. Ct. 676, 60 L. Ed. 1202.

Under the evidence in this case, the court and the jury had a right to conclude that Andrews, the agent, was guilty of perpetrating a fraud in filling the application with untrue representations after knowing the facts, and that the appellee had no opportunity to know that such fraud had been committed until after the policy was issued and delivered. If mere possession of the policy under the circumstances detailed in the testimony is sufficient to charge the appellee, as a matter of law, with notice of its contents, regardless of his failure to read it, then the court should have held that the policy was void. But, if it may be said that under the evidence the court had a right to conclude that the appellee was legally excusable for failing to read the policy after its delivery, the question of validity was properly determined in the trial below. We think that in a suit of this character the appellee was not charged as a matter of law with a knowledge of the contents of his application for insurance. In order to avoid the policy, it is necessary to conclude that the appellee was guilty either of colluding with appellant's agent to deceive the company, or of knowingly concealing the acts of deception committed by the agent. There was no occasion for the appellee to examine the application for the purpose of discovering the existence of false representations. He had a right to rely upon the assurance of the agent that the questions in the application would be correctly answered in accordance with the information which had been given. He had no reason to suspect that the agent had perpetrated a fraud by inserting false

representations. The policy did not upon its face disclose any misrepresentations. He could have learned that fact only by reading the application. In Kister v. Lebanon Mutual Ins. Co., 128 Pa. 553, 18 A. 447, 5 L. R. A. 646, 15 Am. St. Rep. 696, the court said:

"We cannot say that the law, in anticipation of a fraud upon the part of a company, imposed any absolute duty upon Kister to read his policy when he received it, although it would certainly have been an act of prudence on his part to do so"—citing Howard Ins. Co. v. Bruner, 23 Pa. 50; Union Mut. L. Ins. Co. v. Wilkinson, 13 Wall. 222, 20 L. Ed. 617.

Continuing, the court said:

"One thing is certain, however; the company cannot repudiate the fraud of its agent, and thus escape the obligations of a contract consummated thereby, merely because Kister accepted in good faith the act of the agent without examination."

The principle announced in that case we think may well be applied in this.

Appellee has cited the following cases as supporting the holding of the trial court: North American Co. v. Trenton (Tex. Civ. App.) 99 S. W. 740; Banking Co. v. Stone, 49 Tex. 13; Union Ins. Co. v. Wilkinson, 80 U. S. (13 Wall.) 232, 20 L. Ed. 617; Home Ins. Co. v. Bank, 88 Tenn. 369, 12 S. W. 915; Southern Surety Co. v. Butler (Tex. Civ. App.) 247 S. W. 611. In North American Co. v. Trenton, the court said:

"The general rule is that, if an agent of an insurance company, authorized to solicit insurance, either fraudulently or negligently inserts in the application false answers to questions correctly answered by the applicant, his wrong will be imputed to the company, and it will be estopped to defend an action upon the ground of the falsity of the answers."

In Union Ins. Co. v. Wilkinson this language is used:

"In the Fifth Edition of American Leading Cases, 917, after a full consideration of the authorities, it is said: 'By the interested or officious zeal of the agents employed by the insurance companies in the wish to outbid each other and procure customers, they not infrequently mislead the insured, by a false or erroneous statement of what the application should contain; or, taking the preparation of it into their own hands, procure his signature by an assurance that it is properly drawn, and will meet the requirements of the policy. The better opinion seems to be that, when this course is pursued, the description of the risk should, though nominally proceeding from the insured, be regarded as the act of the insurers.' Rowley v. Ins. Co., 36 N. Y. 550. The modern decisions fully sustain this proposition, and they seem to us founded in reason and justice, and meet our entire approval. This principle does not admit oral testimony to vary or contradict that which is in writing, but it goes upon the idea that the writing offered in evidence was not the instrument of the party whose name is signed to it; that it was pro-

cured under such circumstances by the other side as estops that side from using it or relying on its contents; not that it may be contradicted by oral testaimony, but that it may be shown by such testimony that it cannot be lawfully used against the party whose name is signed to it."

■ Appellant refers to the case of Texas State Mut. Fire Ins. Co. v. Richbourg, 257 S. W. 1089, decided by the Commission of Appeals, as holding to the contrary. That suit was based upon a fire insurance policy, and the misrepresentations contained in the application were treated by the court as warranties. The evidence showed that the blanks in the application were filled in in the presence of the insured by the agent of the company and before the application was signed. The court held that the company was not estopped to avoid the policy on account of the untruthfulness of the warranties contained in the application. In the course of the opinion the court said:

"We do not find it necessary to decide whether an insurance company will be estopped from avoiding a policy where false representations have been written into the application by the agent when the agent's authority is a limited one, as in this case, there being nothing in the application itself showing the limitation on the agent's authority. The rule seems to be well settled in this state to the effect that, when the limitation is expressed in the application or in the policy in such way that the insured is charged with knowledge thereof, the company will not be estopped by the wrongful acts of the agent. * * * But, whatever may be the general rule as to estoppel by reason of the agent's acts, it has no application to this case. It is the established law of this state, and of many states, that, where false statements and representations, which are warranted to be true, are written into an application for insurance by the agent, and the applicant knows or has the means of knowing that such statements are contained in the application, and are not true, the insurance company is not precluded from avoiding the policy where it has been conditioned upon such false representations"—citing numerous cases.

The court apparently based its ruling in that case upon the ground that the applicant had an opportunity to read the application, but permitted it to leave his possession containing warranties that the statements therein were true after his signature was attached. In some of its features that case is similar to the one here under consideration. But it differs in some material respects. There the representations were written into the application by the agent in the presence of the applicant and before the application was signed. Here that was not done. In that case the misrepresentations were treated by the court as warranties constituting the basis for the issuance of the policy. In this case the representations contained in the application are not warranties. See article 4732, Revised Civil Statutes. Notwithstanding the simi-

larity in the facts of the two cases, we think the distinguishing features are sufficient to justify the action of the trial court in sustaining the validity of the policy.

Appellee's suit is based upon the following provision of the policy:

"Or if the period of total loss of time commencing on the date of the accident, during which 'such injury' alone shall wholly and continuously disable and prevent the insured from performing any and every duty pertaining to any business or occupation, the company will pay for the continuous period of such total disability accident indemnity at the rate per month specified in part I."

Part I of the policy specifies $60 per month.

In answer to appropriate interrogatories, the jury found as follows: That the plaintiff sustained a bodily injury solely through violent, external, and accidental means, which alone and from its date wholly and continuously disabled and prevented him from performing any and every duty pertaining to any business or occupation; that such disability continued from October 7, 1925, to November 30, 1927. The evidence tended to show that the disability still existed at the date of the trial. It is contended that the eivdence does not support the findings of the jury upon that issue. Appellee testified that at the time the injury occurred he was standing on a scaffold 23 feet high; that he fell on his back and sustained serious bodily injuries. His injuries were such that he was taken to a hospital, where he remained 52 days. For some time after he left the hospital he had to use crutches in walking. Later he was able to walk a little with the aid of a stick. He testified:

"I can take the stick and for a few steps I can walk without it, provided I have got on my support. I wear something to support my body. It is a band about 12 inches wide, made something like a corset, only it laces in the back and draw it together with a strap. I can't go without that, simply because when I go without it throws me in bed. I wear it day and night; never without it. My injury causes me pain continuously. Beginning with my injury I was under the treatment of doctors up there continuously for the 52 days that I was in the hospital. Since I have been home I have been continuously under the care of doctors, and now have the medicine of doctors that I am taking. * * * The pain that the injury causes me is very great. I can't sleep at night. I am not able to do any work; not to say work. I tinker around to try to provide a support for my little fellows; but to work—I am not able to do it. I think it was in the spring of last year that I made my first attempt to provide a little meat and bread after I was injured. I tried to work down here in a chili joint serving chili over the counter. I wasn't able to do that, simply because it caused me so much misery to stand on my feet; and I didn't have to stand but a few minutes at a time. At that time I was in such a physical condition that I couldn't do it at all; wasn't able to do it. I tried to do it because it was either that or starve. It caus-

ed me a great deal of pain to try to do that work. It was very great pain. I suppose I stuck to that about 10 days, or a little less. I was there 2 weeks. I didn't earn any salary for doing that, very little; couldn't call it a salary."

There was some testimony tending to show that after his injury appellee worked in a meat market operated by a Mr. Keele. As to what he did there, he thus testifies:

"I think it was along about July, or probably August, when I began doing that. It was during the summer of this year when I went down there to try to help Mr. Keele out. I get no salary for that. I am not able to act as a meat cutter, and am not worth a salary as a meat cutter, because I can't do the work. I couldn't stand up to do the work that would be required of a meat cutter. I can't lift anything, not without causing myself great pain and great suffering. * * * I am not able to perform any substantial part of the duties of a painter, and have not been since I was injured. I am not able to perform any substantial part of any trade or occupation, and have not been since I was injured. I have not made or earned any salary of any kind since I was hurt."

One of appellee's physicians testified as follows:

"X-ray examinations, made soon after the injury and repeated time since, show fracture at base of spine in bone known as sacrum where it joins the ilium. This is at the foundation of the spinal column and runs down the middle of your back. It is right at the very base of the spine. It is the center or foundation of the entire support of the body. The bond is not knit together. There is still a break. The line is still open. * * * In addition to this injury, Worthy's twelfth rib is freely movable at the head, and produces a grating sound. Where the rib joins, the spinal structure has been torn. This produces pain in the twelfth intercostal nerve. * * * These injuries will last him as long as he lives. * * * Those conditions in this man will cause extreme pain on any unusual motion. In carrying on any avocation or trade where a reasonable amount of activity is required, it is necessary for there to be tension and stretching of those parts of the body that I have described. Those muscles will have to be used in manual labor. Any substantial movement brings into play the abnormal and damaged conditions of this man. This man has no proper use of his body. It prevents him from using his left leg. He can move it at the cost of pain. It has produced an atrophy and shrinking of his leg. In my opinion he is totally or substantially incapacitated from performing physical labor. In my opinion that condition will exist throughout his life. In my opinion he is not now and has not since I have been examining him been able to perform any substantial part of any manual occupation or labor. * * * Having reference to the fact that there is no bony union in this vital structure of the body that supports the whole weight, in my opinion he won't be able to engage in any occupation requiring physical exertion. In my opinion he can't stand on his feet without pain. Having no proper union there, unless he takes

care of himself, slight injuries will cause an aggravation of his condition. Lifting or straining or stretching would aggravate his condition."

Another physician testified:

"This is a serious permanent injury. He wears a brace around there to keep those bones from slipping. This joint ought to be fixed. This man's is movable. From my experience and practice of medicine and surgery for 40 years, I have never seen a case where there is a bony union of this bone at the base of the spine after a complete fracture or severance, as in this case. The pain it produces is intense. That is a permanent condition. In my opinion he is permanently incapacitated to do any substantial part of any trade or occupation where it requires movement of his body. He couldn't do it. I think that condition will exist as long as he lives."

■■ After a careful examination of the record we have concluded that the evidence was sufficient to support the findings of the jury upon the issue of total disability. It may be that appellee was physically able to perform some light labor, or to do some few things that would earn compensation; but that fact would not conclusively negative total disability within the meaning of his policy. Such provisions should be liberally construed in favor of the insured. There is a wide range between absolute physical helpfulness and normal physical capacity to labor. It would be unreasonable to say that, in order to constitute total disability within the meaning of the policy, the insured must be unable to perform any small detail in pursuance of some remunerative employment. Such a construction would in many cases render contracts of this character of little value to those who have them. We think it is sufficient if his injuries are such that he could not, in the exercise of ordinary prudence, perform any substantial part of the labor required in following some remunerative business or occupation. He should not be expected to labor when the exertion caused great pain or tended to aggravate his physical injuries. We think, that view is in harmony with the following authorities: Fidelity Co. v. Joiner (Tex. Civ. App.) 178 S. W. 806, and cases there cited; Commonwealth Bonding Co. v. Bryant (Tex. Sup.) 240 S. W. 893; North American Co. v. Miller (Tex. Civ. App.) 193 S. W. 750.

Appellant contends that, if the appellee is entitled to any compensation, it is for partial disability only. The suit is not for partial, but for total, disability; and, as stated above, we think the proof supports that claim.

■ Among the errors assigned is the refusal of the court to permit the appellant to introduce in evidence and exhibit to the jury pictures of the plaintiff in action, such as are commonly called "motion pictures." It is stated in the assignment that those pictures would have conclusively shown that the claims of the plaintiff as to total disability were untrue. The court refused to permit the introduction of those pictures, apparently upon the ground that they were not properly identified or their correctness shown. We are not prepared to say that the court abused his discretion in ruling as he did. The bills of exception do not contain the pictures, nor show what they would disclose; nor do the bills of exception show how the pictures were to be exhibited to the jury. It is a matter of common knowledge that pictures showing a person in action may be made very deceptive by the operator of the machine used in taking the pictures. The subject of the pictures in this instance was before the jury, and the nature and extent of his injuries were fully inquired into. He admitted doing the only labor which appellant relied on to disprove the claim of total disability. We think the court correctly refused to admit the pictures. Gibson v. Gunn, 206 App. Div. 464, 202 N. Y. S. 19; Rodick v. Ry. Co., 109 Me. 530, 85 A. 41; 22 Corpus Juris, 914.

■ Appellant also complains of the action of the court in permitting appellee's wife and another witness to testify that appellee suffered great pain. The objection to that testimony, as stated in the assignment, is that it was immaterial and irrelevant. Appellee testified that he did suffer great pain. His physicians testified that the character of his injuries was calculated to cause great pain and physical suffering. We think the admission of the testimony, if error, was harmless. It was only cumulative of other undisputed testimony to the same effect.

■ The record shows that this case continued over several days. The appellant complains that the court erred in failing to instruct the jury at the end of each session of the court not to discuss the case among themselves or with other parties. The record shows that the court gave that instruction when the jury was first permitted to separate. He merely refused to repeat it each time the court adjourned. There is no complaint of any misconduct of the jury. The assignment is overruled.

■ The judgment rendered includes $800 as attorney fees. It is contended in this appeal that this allowance is excessive. We are inclined to think it is. In determining the value of the legal service, this suit should probably be regarded as involving more than the amount recovered. The validity of the policy was in issue, and that question is settled by the judgment rendered. The only remaining controversy which may hereafter arise causing further litigation will be the right to collect future indemnities. Taking that fact into consideration, we think $500 would be a reasonable allowance as attorney's fees.

If the appellee shall within 15 days from this date remit the sum of $300 as attorney's

fees, the judgment of the trial court will be affirmed; if that is not done, it will be reversed, and the cause remanded for a new trial.