## SOUTHERN SURETY CO. v. CALHOUN.

### No. 4119.

Court of Civil Appeals of Texas. Texarkana.
Dec. 2, 1931.

Rehearing Denied Dec. 17, 1931.

Cantey, Hanger & McMahon, W. D. Smith, and J. A. Gooch, all of Fort Worth, for appellant.

Ernest May, of Fort Worth, for appellee.

SELLERS, J.

The appellee Hugh L. Calhoun, Jr., brought this suit in the district court of Tarrant county against the appellant to recover upon a certain accident insurance contract. In his amended petition, appellee alleged that on or about August 7, 1925, appellant issued to appellee an accident insurance policy whereby said appellant agreed to insure appellee against loss from bodily injury effected through accidental means directly and independently of all other causes, and that on such day and date, namely, January 24, 1930, appellee sustained bodily injury effected through accidental means, directly and independently of all other causes, which had resulted in his continuous and total disability to perform any kind of duty pertaining to his occupation, and that such disability persisted up to the filing of his petition, which was filed January 10, 1931; also that he had become unconscious and that he had fallen to the floor of the bathroom against or very near a gas stove which was burning, and that while in such unconscious condition appellee was severely burned, and that on account of such injury, resulting from the inhalation of carbon monoxide gas and a burn sustained by appellee, he has been continually and totally disabled from performing any kind of duty pertaining to his occupation from the date of said injury to the time of the filing of said petition. Appellee further pleaded he had given notice to the insurance company of such disability, and that such company failed to pay the weekly indemnities provided in said policy, and that he had been forced to hire an attorney to prosecute a claim against said company.

The appellant answered by general denial, and also pleaded that appellee had not given the appellant notice of injury within the terms of the policy sued upon; and, further, that appellee was not suffering from bodily injury effected through accidental means directly and independently of all other causes, but that the condition of appellee at that time and prior thereto was not the result of any accidental means, but that appellee was suffering from some disease or diseases resulting from natural causes, and not the result of accidental means and not resulting directly and independently of all other causes.

The policy which was introduced in evidence by both parties provides:

"In consideration of the statements in the application for this policy, copy of which is endorsed hereon, and made a part hereof, and of—Forty-two and 50/100—Dollars—($42.50) —premium,

"Does hereby insure—Hugh L. Calhoun, Jr. —. (1) against loss resulting from Bodily Injuries, effected through Accidental Means, directly and independently of all other causes (suicide, while sane or insane, not covered), as follows:

"Section 1. Principal Sum—Seven Thousand Five Hundred and No/100—Dollars ($7,500.00)—. Weekly indemnity—Twenty Five and No/100—Dollars ($25.00). * * *

"Section 7. * * * and involuntary asphyxiation, shall be deemed bodily injuries within the meaning of this policy."

There was evidence to the effect that the weather on January 24, 1930, and for several days before, was extremely cold; that appellee's wife was away from home on a visit; that the gas stove in the bathroom had been burning continuously for several days; and that during all this time the windows and doors in the house were kept closed.

It is undisputed that carbon monoxide gas is a deadly poison, and that it is produced by the burning of natural gas when there is an improper mixture of gas and air passing to the burner of a gas stove.

There was evidence offered by appellant that the gas stove in appellee's home was properly adjusted when examined a few days

after the injury complained of, and that a gas stove when properly adjusted will not give off carbon monoxide gas, and a number of experiments were made in the presence of the jury by an expert chemist in an effort to prove to the jury that there could not have been any carbon monoxide gas produced by the stove in appellee's bathroom.

The evidence further shows that appellee on the night of January 23d, had supper with his mother-in-law, Mrs. E. G. Rall, who lives just across the street from his home; that he went to his home about seven o'clock. The evidence of the finding of appellee and his condition as related by some of the witnesses is as follows:

Mrs. E. G. Rall testified: "The next time I saw Mr. Calhoun was, I think, about 9:30 o'clock the next morning. At that time I saw him in the bathroom over at his house. When I saw him at that time he was lying on the floor, perfectly unconscious. He had on his pajama trousers. He was lying with his head up this way (indicating), and his left ankle in front of the stove; his left leg was near the stove, and he was burned. The way I got in the house when I went over there the next morning was that the colored man let me in the back door—the kitchen door, and the colored man had climbed up the back porch and gone in a window. The window that he went in was unlocked, but not open. It was not a bathroom window that he went in, but a window in a little sleeping room on the back. When I got to the bathroom, the door was partly open * * * I went right in and when I got in the bathroom the stove was still burning * * * I was in the bathroom only just long enough to turn out the fire and to help the negro lay Mr. Calhoun on the bed. The first thing I did was to turn out the fire, and then the colored man and I picked Mr. Calhoun up and laid him on the bed. When I went into the bathroom on this occasion to help the negro move Mr. Calhoun, the bathroom window was not open at that time. * * * The only window that was open in Mr. Calhoun's house when I got over there that morning was the one French window that I spoke of a while ago. It was unlocked, but was not open."

Dr. Clay Johnson, a practicing physician of Fort Worth, testified:

"I remember seeing Mr. Calhoun on or about the morning of January 24, 1930; it was about that time, but I don't remember the exact date. * * * When I arrived at the Calhoun residence Dr. Hodges McKnight was there and after I got there Dr. Heb Beall came out. When I got out to Mr. Calhoun's residence he was in the bed in his bedroom, covered up, and it is my recollection that he was shaking, * * * he was very purple; his color was what we doctors call cyanotic, and what is commonly called by the lay people, purple. We went over him pretty carefully, but he was entirely unconscious and we could not get any response out of him in any way. He had a very bad burn on one of his legs; his pulse was exceedingly rapid, and almost imperceptible; you could hardly detect any pulse with him; I thought it was a question of only a very short time until he would die; it looked like that he was almost dead then, from his general appearance and what examination we gave him then. Dr. McKnight and I were both there, and realizing, as we thought, his serious condition, I suggested that we have another doctor in consultation; it was a very grave case, it appeared to me, and I telephoned and asked Dr. Heb Beall to come out and see him with us, he came out and we examined him and discussed the case at some length and we decided that the best thing for him was to be sent to the hospital, where he could have more and better detailed attention, and we called an ambulance and sent him out to the Cook Hospital. From the examination that we three doctors made there, I formed a conclusion as to the cause of Mr. Calhoun's condition, and I have not had occasion since that time to change that opinion. My opinion was that it was due to carbon monoxide poison, from gas.

"Most of the examinations that were made of Mr. Calhoun after he got to the hospital were made by the doctors of the hospital—Dr. Heb Beall, Dr. Garrett, Dr. Nabors and some of the other doctors. They examined his blood and that revealed carbon monoxide. So far as my observation of Mr. Hugh Calhoun's present condition goes, he is very much impaired mentally from his former condition; his mental condition is very much impaired. * * * Another condition that is present now is that he is unable to walk with any certainty of himself; he is unable to walk by himself; he has to have some support. I think Mr. Calhoun's condition is the result of carbon monoxide poison. The reason I say that is because carbon monoxide poison is supposed to produce certain changes in the higher nervous centers; these changes, when they reach a certain stage, do not recover and they stay and leave a permanent injury; they are supposed to be a damage to the blood cells therefrom; I expect very small hemorrhages may be from pressure, but that is what the result of it is to the higher nervous centers—maybe to the spinal cord and to the brain. His condition is what we call a spastic condition—a jerky condition sorter like a horse that is string haltered. The last time I saw Mr. Calhoun was at breakfast this morning—I was over there. I know what his physical condition is at this time. His present condition is due to carbon monoxide poison, and it is my opinion that his present condition is permanent."

Dr. Hodges McKnight testified: "I saw Mr. Calhoun every day while he was in the hospital and sometimes three or four times a day. For about two months after he left the hospital I suppose I saw him every day or at least every other day, anyway. I don't recall exactly how long Mr. Calhoun was at the hospital, but he was there several months. As a result of my observation and attendance upon Mr. Calhoun, I did form an opinion as to the cause of his condition. I have not changed that opinion, but still have my final conclusion. In my opinion, the cause of Mr. Calhoun's present condition is carbon monoxide poison. Probably, when Mr. Calhoun first came into the hospital one of the first tests that was made was a test to see whether he had carbon monoxide in his blood. Carbon monoxide in the blood is a text for carbon monoxide poison. The best test for carbon monoxide poison is to find carbon monoxide in the blood. To find carbon monoxide combined with the hemoglobin of the blood is an infallible test for carbon monoxide poison."

Dr. K. H. Beall testified: "My opinion as to the cause of the condition in which I found Mr. Calhoun was carbon monoxide poison; that is poison by monoxide of carbon gas, or carbon monoxide. The history of his case showed the gas stove burning for quite a while, and then he had the appearance of a person poisoned by gas in every detail and when I got him to the hospital our examinations all proved that was the condition. There was a test of his blood made at the hospital; a test was made for carbon monoxide and the result of the test was positive—strongly positive. The blood test that was made is an infallible test for carbon monoxide poison."

The court submitted the case to the jury on the following issues:

"No. 1: Did the plaintiff, at his home in Fort Worth, Texas, on or about January 24, 1930, accidentally inhale carbon monoxide gas? Answer: 'Yes.'

"No. 2: If you have answered Question No. One yes, then answer:

"Did such accidental inhalation of carbon monoxide gas directly and independent of all other causes result in plaintiff's continuous and total disability to perform any kind of duty pertaining to his occupation? Answer: 'Yes.'

"No. 3: What sum, if any, do you find to be a reasonable fee to plaintiff's attorney in this case? Answer: $1,500.00."

Upon the answers of the jury to the issues as submitted, the court entered judgment for the appellee for the sum of $1,988, being the amounts of benefit accrued under the policy, plus 12 per cent. penalty, and the further sum of $1,500 attorney's fee. There are about seven reasons urged under appellant's assignment that the court erred in refusing to instruct the jury at the close of the evidence to return a verdict in its favor; but, as we view them, they raised but two points: First, that the evidence was insufficient to show the injury as alleged; and, second, that if an injury was shown, the evidence was not sufficient to show it was received by accidental means.

That there was no error committed by the court on the first ground stated, we think is at once apparent from the facts and circumstances of this case. The fact is undisputed from the evidence that, if the appellee was suffering from the effects of inhaling carbon monoxide gas, he inhaled it at his home. Then the question is, Was the evidence sufficient to show that appellee inhaled carbon monoxide gas? The evidence shows that appellee was found almost dead in the bathroom of his home where a gas stove had been burning for some time, with all openings to the house tightly closed. There is evidence to the effect that carbon monoxide gas is most likely to be found under such circumstances; that appellee had every symptom of gas poisoning when found; that tests were made of appellant's blood and carbon monoxide was found; and that the test made was an infallible test for carbon monoxide poison. Such evidence is believed to be sufficient to support the jury's finding to special issue No. 1.

Assuming, as we must, that appellee accidentally inhaled carbon monoxide gas and was thereby injured, the question arises: Was appellee injured by accidental means? Under section 7 of the policy, quoted above, an injury such as involuntary asphyxiation was insured against, and this express contractual stipulation should be given the effect of relieving the insured of the necessity of proving that the injury was of the class effected through accidental means. And we are of the opinion that such injury was effected through accidental means. Yates v. International Travelers' Ass'n. (Tex. Civ. App.) 16 S.W.(2d) 301; Id. (Tex. Com. App.) 29 S.W. (2d) 980; International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.(2d) 282.

Appellant attacks the $1,500 attorney's fee allowed appellee in the trial court as excessive. We are of the opinion that this contention should be sustained, and that $750 would be a reasonable attorney's fee in this case. Massachusetts Bonding & Ins. Co. v. Worthy (Tex. Civ. App.) 9 S.W.(2d) 388.

All of appellant's assignments have been considered, and those not mentioned are deemed without merit and are overruled.

If the appellee shall within fifteen days from this date remit the sum of $750 of the attorney's fee, the judgment of the trial court will be affirmed; but, in the absence of such remittitur, the judgment will be reversed and the cause remanded for new trial.